# OPERATING AGREEMENT

## OF

## NEXGEN LIFESCIENCES, LLC



## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE II - FORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.1    Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.2    Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    2.3    Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.4    Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.5    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.6    Registered Agent and Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    2.7    Principal Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE III - NATURE OF BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE IV - ACCOUNTING AND RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.1    Records to be Maintained . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.2    Reports to Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.3    Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE V - NAMES AND ADDRESSES OF MEMBERS . . . . . . . . . . . . . . . . . . . 9

ARTICLE VI - RIGHTS AND DUTIES OF MEMBERS . . . . . . . . . . . . . . . . . . . . . 9
    6.1    Management Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    6.2    Majority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    6.3    Liability of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    6.4    Indemnifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    6.5    Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    6.6    Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE VII - MANAGING MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    7.1    Original Managing Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    7.2    Term of Offices Managing Member . . . . . . . . . . . . . . . . . . . . . . . . . 11
    7.3    Authority of Members to Bind the Company . . . . . . . . . . . . . . . . . . . . 11
    7.4    Actions of the Managing Members . . . . . . . . . . . . . . . . . . . . . . . . . 12
    7.5    Compensation of Managing Member . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.6    Managing Members' Standard of Care . . . . . . . . . . . . . . . . . . . . . . . 13
    7.7    Removal of Managing Member . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE VIII - CONTRIBUTIONS AND CAPITAL ACCOUNTS . . . . . . . . . . . . 13
    8.1    Initial Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    8.2    Additional Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    8.3    Enforcement of Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    8.4    Maintenance of Capital Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    8.5    Distribution of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    8.6    Sale or Exchange of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    8.7    Compliance with Section 704(b) of the Code . . . . . . . . . . . . . . . . . . . 15

ARTICLE IX - ALLOCATIONS AND DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . 15
    9.1    Allocations of Net Profits and Net Losses from Operations . . . . . . . . . . . 15
    9.2    Company Minimum Gain Charge back . . . . . . . . . . . . . . . . . . . . . . . 15
    9.3    Member Minimum Gain Charge back . . . . . . . . . . . . . . . . . . . . . . . . 16
    9.4    Qualified Income Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    9.5    Interim Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE X - TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

*am/am*

10.1    Elections.................................................... 16
10.2    Taxes of Taxing Jurisdictions............................. 16
10.3    Tax Matters Partner....................................... 17
10.4    Cash Method of Accounting................................. 17

ARTICLE XI - DISPOSITION OF MEMBERSHIP INTERESTS............. 17
11.1    Disposition............................................... 17
11.2    Dispositions not in Compliance with this Article Void.... 17

ARTICLE XII - DISSOCIATION OF A MEMBER....................... 18
12.1    Dissociation.............................................. 18
12.2    Rights of Dissociating Member............................. 19

ARTICLE XIII - ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS 19
13.1    Rights of Assignees....................................... 19
13.2    Admission of Substitute Members........................... 20
13.3    Admission of Additional Members........................... 20

ARTICLE XIV - DISSOLUTION AND WINDING UP.................... 20
14.1    Dissolution............................................... 20
14.2    Effect of Dissolution..................................... 20
14.3    Distribution of Assets on Dissolution..................... 20
14.4    Winding Up and Certificate of Dissolution................. 21

ARTICLE XV - AMENDMENT....................................... 21
15.1    Operating Agreement May Be Modified....................... 21
15.2    Amendment or Modification of Operating Agreement.......... 21

ARTICLE XVI - MISCELLANEOUS PROVISIONS...................... 21
16.1    Entire Agreement.......................................... 21
16.2    No Partnership Intended for Nontax Purposes............... 21
16.3    Rights of Creditors and Third Parties under
        Operating Agreement.......................................

*ao/ĹM*

## OPERATING AGREEMENT
## OF
## NEXGEN LIFE SCIENCES, LLC.

This Operating Agreement of NEXGEN LIFE SCIENCES, LLC, a Wyoming limited liability company organized pursuant to the Wyoming Limited Liability Company Act is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement as Members.

## ARTICLE I
## DEFINITIONS

For purposes of this Operating Agreement (as defined below), unless the context clearly indicates otherwise, the following term shall have the following meanings:

**1.1**   **Act** - The Wyoming Limited Liability Company Act and all amendments to the Act.

**1.2**   **Additional Member** - A Member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

**1.4**   **Articles** - The Articles of Organization of the Company as properly adopted and amended from time to time by the Members and filed with the Secretary of State.

**1.5**   **Assignee** - A transferee of a Membership Interest who has not been admitted as a Substituted Member.

**1.6**   **Bankrupt Member** - A member who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code, 92) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership proceeding, an action for liquidation arrangement, composition, readjustment, dissolution, or similar relief.

**1.7**   **Business Day** - Any day other than Saturday, Sunday or any legal holiday observed in the State.

**1.8**   **Capital Account** - The account maintained for a Member or Assignee determined in accordance with Article VIII.

**1.9**   **Capital Contribution** - Any contribution of Property, services or the obligation to contribute Property or services made by or on behalf of a Member or Assignee.

OPERATING AGREEMENT

4

**1.10   Code** - The Internal Revenue Code of 1986 as amended from time to time.

**1.11   Commitment** - The Capital Contributions that a Member or Assignee is obligated to make under this Operating Agreement.

**1.12   Company** - NEXGEN LIFE SCIENCES, LLC ., a limited liability company formed under the laws of Wyoming, and any successor limited liability company.

**1.13   Company Liability** - Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

**1.14   Company Minimum Gain** - An amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain and increases and decreases in Company Minimum Gain are intended to be computed in accordance with § 704 of the Code the Regulations issued thereunder, as the same may be issued and interpreted from time to time. A Member's share of Company Minimum Gain at the end of any Taxable Year equals: the sum of Nonrecourse Deductions allocated to that Member (and to that Member's predecessors in interest) up to that time and the distributions made to that Member (and to that Member's predecessors in interest) up to that time of proceeds of a nonrecourse liability allocable to an increase in Company Minimum Gain minus the sum of that Member's (and that Member's predecessors' in interest) aggregate share of the net decreases in Company Minimum Gain plus their aggregate share of decreases resulting from revaluations of Company Property subject to one or more Company Nonrecourse Liabilities.

**1.15   Company Nonrecourse Liability** - A Company Liability to the extent that no Member or related Person bears the economic risk of loss (as defined in § 1.752-2 of the Regulations) with respect to the liability.

**1.16   Company Property** - Any Property owned by the Company.

**1.17   Contributing Members** - Those Members making contributions as a result of the failure of a Delinquent Member to make the contributions required by the Commitment as described in Article VIII.

OPERATING AGREEMENT

1.18   **Default Interest Rate** - The higher of the legal rate or the then-current prime rate quoted by the largest commercial bank in the principal selection of the Principal Office plus three percent.

1.19.   **Delinquent Member** - A Member or Assignee who has failed to make other Committed or Exit Member or Assignee.

1.20   **Distribution** - A transfer of Property to a member on account of a Membership Interest as described in Article IX.

1.21   **Disposition (Dispose)** - Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.22   **Dissociation** - Any action which causes a Person to cease to be a Member as a described in Article XII hereof.

1.23   **Dissolution Event** - An event, the occurrence of which will result in the dissolution of the Company under Article XIV unless the Members agree to the contrary.

1.24   **Effective Date** – **January 1st 2015**

1.25   **Immediate Family** - A Member's Immediate Family includes the Member's spouse, children (including natural ,adopted and stepchildren), grandchildren, and parents.

1.26   **Initial Capital Contribution** - The Capital Contribution agreed to be made by the Initial Members as described in Article VIII.

1.27   **Initial Members** - Those persons identified on Exhibit A attached hereto and made a part hereof by this reference who have executed the Operating Agreement.

1.28   **Majority** - The affirmative vote or consent of more than one-half (1/2) of the membership interest of all Members described as a "Majority" in Article VI hereof.

1.29 **Management Right** - The right of a Member to participate in the management of the Company, including the rights to information and to consent or approve actions of the Company.

1.30   **Managing Member** - A Member selected to manage the affairs of the Company under Article VII hereof.

1.31   **Member** - Initial Member, Substituted Member or Additional Member, and, unless the context expressly indicates to the contrary, includes Managing Members and Assignees.

OPERATING AGREEMENT

6

1.32   Member Minimum Gain - An amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the other Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and Increases and decreases in Member Minimum Gain are intended to be computed in accordance with § 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

**1.33   Member Nonrecourse Liability** - Any Company Liability to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under § 1.752-2 of the Code because, for example, the Member or Related Person is the creditor or a guarantor.

**1.34   Membership Interest** - The rights of a Member or, in the case of an Assignee, the rights of the assigning Member in Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company.

1.35   Money - Cash or other legal tender of the United States, or any obligation that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a fair market value equal to its face amount.

1.36   Net Losses - The losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.

**1.37   Net Profits** - The income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.

**1.38   Nonrecourse Liabilities** - Nonrecourse liabilities include Company Nonrecourse Liability and Member Nonrecourse Liabilities.

OPERATING AGREEMENT

**1.39   Notice** - Notice shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Managing Member in care of the Company at the address of the Principal Office. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

**1.40   Offsettable Decrease** - Any allocation that unexpectedly causes or increases a deficit in the Member's Capital Account as of the end of the taxable year to which the allocation relates attributable to depletion allowances under §1.704(b)(2)(iv)(k) of the Regulations, adjustments of loss and deductions under §§1.704(b)(2) or 704 of the Code or under §1.704-4 of the Regulations, or distributions that, as of the end of the year are reasonably expected to be made in the extent they exceed offsetting increases to such Member's Capital Account that reasonably are expected to occur during or prior to the taxable years in which such distributions are expected to be made other than increases pursuant to a Minimum Gain Chargeback.

**1.41   Operating Agreement** - This Operating Agreement including all Subscription Agreements, if any, and amendments adopted in accordance with the Operating Agreement and the Act.

**1.42   Organization** - A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

**1.43   Organization Expenses** - Those expenses incurred in the organization of the Company including the costs of preparation of the Operating Agreement and Articles.

**1.44   Proceeding** - Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree, or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other person subject to the jurisdiction of such court, arbitrator, or governmental agency.

**1.45   Property** - Any property real or personal, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**1.46   Permitted Transferee** - Any member of the Member's Immediate Family, or an Organization controlled by such Member or by members of the Member's Immediate Family.

**1.47   Person** - An individual, trust, estate, or any incorporated or unincorporated organization permitted to be a member of a limited liability company under the laws of the State.

OPERATING AGREEMENT

8

**1.48    Proceeding** - Any administrative, judicial, or other action, proceeding, including, without limitation, litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

**1.49    Regulations** - Except where the context indicates otherwise, the permanent, temporary, proposed, or proposed and temporary regulations of the Department of the Treasury under the Code as such regulations may be lawfully changed from time to time.

**1.50    Related Person** - A person having a relationship to a Member that is described in §1.751-4(b) of the Regulations.

**1.51    Resignation** - The act by which a Managing Member ceases to be a Managing Member.

**1.52    Sharing Ratio** - With respect to any Member, the percentage of ownership in the Company as specified on Exhibit A to this Operating Agreement.

**1.53 Subscription Agreement** - Agreement between a Member and the Company to fulfill the Commitment defined in 1.11 of this Article.

**1.54    Substitute Member** - An Assignee who has been admitted to all of the rights of membership pursuant to the Operating Agreement.

**1.55    Taxable Year** - The taxable year of the Company as determined pursuant to §706 of the Code.

**1.56 Taxing Jurisdiction** - Any state, local, or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

### ARTICLE II
### FORMATION

**2.1    Organization** - The Members hereby organize the Company as an Wyoming limited liability company pursuant to the provisions of the Act.

**2.2    Agreement** - For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Operating Agreement hereby agree to the terms and conditions of the Operating Agreement, as it may from time to time be amended according to its terms. It is the express intention of the Members that the Operating Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Operating Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, the Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any

OPERATING AGREEMENT

other law or rule. To the extent any provision of the Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**2.3    Name** - The name of the Company is NEXGEN LIFESCIENCES, LLC, and all business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law.

**2.4    Effective Date** - The Operating Agreement shall become effective upon the earlier of the filing and acceptance of the same with the Secretary of State of Wyoming or the date of execution of the Operating Agreement.

**2.5    Term** - The Company shall be dissolved and its affairs wound up in accordance with the Act and the Operating Agreement on December 31, 2025, unless the term shall be extended by amendment to the Operating Agreement and the Articles of Organization, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Operating Agreement.

**2.6    Registered Agent and Office** - The registered agent for the service of process and the registered office shall be that Person and location reflected in the Articles as filed in the office of the Secretary of State. The Managing Members, may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State. If the Managing Members shall fail to designate a replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address through appropriate filings with the Secretary of State.

**2.7    Principal Office** - The Principal Office of the Company shall be located at 8913 Regents Park Dr. Suite # 550, Tampa, FL -33647

## ARTICLE III

## NATURE OF BUSINESS

**3.1    The Company may engage in any lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III.

OPERATING AGREEMENT

10

# ARTICLE IV

## ACCOUNTING AND RECORDS

4.1    **Records to be Maintained** - The Company shall maintain the following records and information, at the Principal Office: 8913 Regents Park Dr. Suite # 550, Tampa, FL -33647.

A.    A current and past list, setting forth the full name and last known mailing address of each member and manager;

B.    A copy of the articles of organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any articles have been executed;

C.    Copies of the Company's federal, foreign, state and local income tax returns and reports, if any, for the three most recent years;

D.    Copies of the Operating Agreement including all amendments thereto and copies of any written operating agreement no longer in effect;

E.    Any financial statements of the Company for the three most recent years;

F.    A writing or other data compilation from which information can be obtained through retrieval devices into reasonably usable form setting forth the following:

(i)    the amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute;

(ii)    the times at which or events on the happening of which any additional Commitments agreed to be made by each Member are to be made;

(iii)    any right of a Member to receive, or of the Company to make, distributions to a Member which include a return of all or any part of the Member's Capital Contributions; and

(iv)    any events upon the happening of which the Company is to be dissolved and its affairs wound up.

4.2    **Reports to Members:**

A.    The Managing Members shall review reports at least annually at such time and in such manner as the Managing Members may determine reasonable.

B.    The Managing Members shall review annually all information returns required by the Code and the laws of any state in which the Company operates.

11

4.3   Accounts - The Managing Members shall maintain a record of all Capital Accounts in accordance with Article VIII.

## ARTICLE V

## NAMES AND ADDRESSES OF MEMBERS

5.1   The names and addresses of the Initial Members are as reflected on Exhibit A attached hereto and by this reference made a part hereof as if set forth fully herein.

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS

6.1   Management Rights - All Members (other than Assignees) who have not Disassociated shall be entitled to vote on any matter submitted to a vote of the Members. Notwithstanding the foregoing, the following actions require the consent of all of the Members:

    A.   any amendment, to this Operating Agreement.

    B.   the admission of Assignees to Management Rights;

    C.   the continuation of the Company after a Dissolution Event.

    D.   the authorization of a Managing Member or Members to do any act on behalf of the Company that exceeds this Operating Agreement which shall require unanimous consent of the Members.

6.2   Majority - Whenever any matter is required or allowed to be approved by a Majority of the Members or a Majority of the Remaining Members under the Act or the Operating Agreement, such matter shall be considered approved or consented to upon the receipt of the affirmative approval or consent, either in writing or at a meeting of the Members, of Members having Sharing Ratios in excess of one half of the Sharing Ratios of all the Members entitled to vote on a particular matter. Assignees, and, in the case of a prior also in withdrawal where consent of the remaining Members is required, disassociating Members shall not be considered Members entitled to vote for the purposes of determining a Majority. In the event of a Member who has disposed of that Member's entire Membership interest to an Assignee, but has not been removed as provided below, the Sharing Ratio of such Assignee shall be considered in determining a Majority, and such Member's vote or consent shall be determined by such Sharing Ratio.

OPERATING AGREEMENT

12

**6.3   Liability of Members** - Except as specifically provided herein a Member status shall be liable as such for the liabilities of the Company. The failure of a limited liability company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this agreement or the Act shall not be grounds for imposing personal liability on the members or managers for liabilities of the limited liability company.

**6.4   Indemnifications** - The Company shall indemnify the Members, Managing Members, and agents for all costs, losses, liabilities and damages paid or accrued by such Member, Manager or agent in connection with the business of the Company, to the fullest extent provided or allowed by the laws of the State.

**6.5   Representations and Warranties** - Each member, and in the case of an organization, the person(s) executing the Operating Agreement on behalf of the organization, hereby represents and warrants to the Company and each other Member that (a) if that Member is an organization, that it is duly organized validly existing, and in good standing under the law of its state of organization and that it has full organizational power to execute and agree to the Operating Agreement to perform its obligations hereunder, (b) that the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest; (c) the Member acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

**6.6   Conflicts of Interest**

A.   A Member, including a Managing Member, shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Members may enter into transactions that are similar to the transactions into which the Company may enter. Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member, without the consent of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company property including information developed exclusively for the Company and opportunities expressly offered to the Company.

B.   A Member, including a Managing Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest, A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction, if either the transaction is fair to the Company or the disinterested Managing Members or disinterested Members, in either case knowing the material facts of the transaction and the Member's interest, authorize, approve, or ratify the transaction.



OPERATING AGREEMENT

17

## ARTICLE VII

## MANAGING MEMBERS

7.1    **Original Managing Members** - The ordinary and usual decisions concerning the business affairs of the Company shall be made by the Managing Members. There shall be two Managing Members who must be Members of the Company. The initial Managing Members shall be Annapurna Giandlapalli irrevocable trust 2010, Sandhya's Irrevocable trust 2007 ( here in after referred as Giandlapalli Group) and Gajan Mahendiran, Amudha Mahendiran Tenants by a Entirety ( here in after referred as Mahendiran Group).

7.2    **Term of Office as Managing Member** - No Managing Member shall have any contractual right to such position. Each Managing Member shall serve until the earliest of:

    A.    the Dissociation of such Managing Member;

    B.    removal of the Managing Member.

    C.    the voluntary withdrawal as a Managing Member by a Member.

7.3    **Authority of Members to Bind the Company** - The Members hereby agree that only the Managing Members and authorized agents of the Company shall have the authority to bind the Company. No Member other than a Managing Member shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Any one Managing Member of the Giandlapalli Group and any one Managing Member of the Mahendiran Group, together, have the combined power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company, including, without limitation:

    A.    the institution, prosecution and defense of any Proceeding in the Company's name;

    B.    the purchase, receipt, lease or other acquisition, ownership, holding, improvement, use and other dealing with, assets, both real and personal, wherever located. However, all the members unanimously engaged Mrs. Sandhya Ajjampu as authorized Executive  Director to commit the Company to the purchase of ANDA's to add to portfolio.

    C .    the sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of Property, both real and personal;

    D.    the entering into contracts and guaranties; incurring of liabilities; borrowing money, issuance of notes, bonds, and other obligations; and the securing of any of its obligations by mortgage or pledge of any of its Property or income;

    E.    the lending of money, investment and reinvestment of the Company's funds, and receipt and holding of Property as security for repayment, including, without limitation, the loaning of money to, and otherwise helping Members, officers, employees,



14

and agents

F.     the conduct of the Company's business, the establishment of Company offices, and the articles of the powers of the Company is interpret under the State;

G.     the appointment of employees and agents of the Company, the defining of their duties, the establishment of their compensation;

H.     the payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

I.     the making of donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

J.     the payment or donation, or any other act that furthers the business and affairs of the Company;

K.     the payment of compensation, or additional compensation to any or all Members and employees on account of service previously rendered to the limited liability company, whether or not an agreement to pay such compensation was made before such services were rendered;

L .     the purchase of insurance on the life of any of its Members, or employees for the benefit of the Company;

M.     the participation in partnership agreements, joint ventures, or other associations of any kind with any person or persons;

N.     the indemnification of Members or any other Person.

7.4     **Actions of the Managing Members** – All two Managing Members have the combined power to bind the Company individually or together as provided in this Article VII. Any difference arising as to any matter within the Authority of the Managing Members shall be decided by a majority in number of the Managing Members. No act of a Member in contravention of such determination shall bind the Company to Persons having knowledge of such determination. Notwithstanding such determination, the act of a Managing Member for the purpose of apparently carrying on the usual way of business or affairs of the Company, including the exercise of the authority indicated in this Article VII, no person dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting on behalf of the Company.

7.5     **Compensation of Managing Member** - Each Managing Member shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation, in an amount to be determined from time to time by the affirmative vote of a Majority of the Members.

SW     15

7.6    Managing Members' Standard of Care -A Managing Member's duty of care in the discharge of the Managing Member's duties to the Company and the other Members is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. In discharging it duties, a Managing Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any of its other Managing Members, Members, or agents, or by any other person, as to matters the Managing Member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to members might properly be paid.


7.7    Removal of Managing Member - Any Managing Member may be removed by the affirmative vote of a Majority of the Members.


## ARTICLE VIII

## CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1    Initial Contributions - Each initial Member shall make its Capital Contribution described for that Member on Exhibit A at the time and in the terms specified on Exhibit A and shall perform that Member's Commitment. If no time for contribution is specified, the Capital Contributions shall be made upon the filing of the Articles of Organization with the Secretary of State. The value of the Capital Contributions shall be as set forth on Exhibit A. No interest shall accrue on any Capital Contribution and no Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Operating Agreement. Each Additional Member shall make the Initial Capital Contribution described in the Admission Agreement. The value of the Additional Member's Initial Capital Contribution is otherwise to be assigned a contribution shall be set forth in the Exhibit A and such Operating Agreement.

8.2    Additional Contributions - In addition to the Initial Capital Contributions and Commitments, the Managing Members may determine from time to time that additional contributions are needed to enable the Company to conduct its business. Upon making such a determination, the Managing Members shall give Notice to all Members in writing at least ten Business Days prior to the date on which such contribution is due. Such Notice shall set forth the amount of additional contribution needed, the purpose for which the contribution is needed, and the day which the Member should contribute. Each Member shall be entitled to contribute a proportionate share of such additional contribution. Except in the event of a Member's unpaid Commitment, no Member shall be obligated to make any such additional contributions. In the event



16

any one or more Members do not make their additional contribution, the other members shall be given the opportunity to make the contributions. Each Additional Member shall make the Capital Contribution to which such Member has agreed, at the time or times and upon the terms to which the Managing Members and the Additional Member agree.

**8.3     Enforcement of Commitments** -In the event any Member (a Delinquent Member) fails to perform the Delinquent Member's Commitment, the Managing Members shall give the Delinquent Member a Notice of the failure to meet the Commitment. If the Delinquent Member fails to perform the Commitment (including any costs associated with the failure to demand compliance with the Commitment and interest on such obligation at the Default Interest Rate) within ten Business days of the giving of Notice, the managing Members may take such action, including but not limited to enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in the Operating Agreement. Each Member expressly agrees to the jurisdiction of such courts but only for the enforcement of Commitments. The Managing Members may elect to allow the other Members to contribute the amount of the Commitment in proportion to such Members' Sharing Ratios, with those Members who contribute (Contributing Members) to contribute additional amounts equal to any portion of the Commitment not completed.

OPERATING AGREEMENT

The Contributing Members shall be entitled to treat the amounts contributed pursuant to this section as a loan from the Contributing Members bearing interest at the Default Interest Rate secured by the Delinquent Member's interest in the Company. Until they are fully repaid, the Contributing Members shall be entitled to all Distributions to which the Delinquent Member would have been entitled. Notwithstanding the foregoing, no Commitment or other obligation to make an additional contribution may be enforced by a creditor of the company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

**8.4     Maintenance of Capital Accounts** -The Company shall establish and maintain Capital Accounts for each Member and Assignee. Each Member's Capital Account shall be increased by (1) the amount of any Money actually contributed by the Member to the capital of the Company, (2) the fair market value of any Property contributed, as determined by the Company and the contributing Member at arm's length at the time of contribution (net of liabilities assumed by the Company or net of liabilities which the Company takes such Property subject to, within the meaning of § 752 of the Code), and

(3) the Member's share of Net Profits and of any separately allocated items of income or gain except adjustments of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Member to reflect the difference between the book value and tax basis of assets contributed by the Member). Each Member's Capital Account shall be decreased by (1) the amount of any Money actually distributed to the Member, (2) the fair market value of any Property distributed to the Member, as determined by the Company and the contributing Members at arm's length value at the time of distribution (net of liabilities of the Company assumed by the Member or net of liabilities which the Member takes such Property subject to within the meaning of § 752 of the Code), and (3) the Member's share of Net Losses and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Member to reflect the difference between the book value and tax basis of assets contributed by the Member).



17

**5.** Distribution of Assets - If the Company at any time distributes any of its assets in-kind to any Member, the Capital account each Member shall be adjusted to account for that Member's allocable share (as determined under Article IX below) of the Net Profits, or Net Losses that would have been realized by the Company had it sold the assets that were distributed at such respective fair market values immediately prior to their distribution.

**8.6 Sale or Exchange of Interest** - In the event of a sale or exchange of some or all of a Member's interest in the Company, the Capital Account of the Transferring Member shall become the capital account of the Assignee, to the extent it relates to the portion of the Interest Transferred.

**8.7 Compliance with Section 704(b) of the Code** - The provisions of this Article VIII as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit

OPERATING AGREEMENT

pursuant to Article IX to have substantial economic effect under the Regulations promulgated under § 704(b) of the Code, hi light of the distributions made pursuant to Articles EX and XIV and the Capital Contributions made pursuant to this Article VIII. Notwithstanding anything herein to the contrary, this Operating Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Contribution.

**ARTICLE IX**
**ALLOCATIONS AND DISTRIBUTIONS**

**9.1** Allocations of Net Profits and Net Losses from Operations - Except as may be required by § 704(c) of the Code, and §§ 2, 3, and 4 of this Article IX, net profits, net losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to their Sharing Ratios.

**9.2** Company Minimum Gain Charge back - If there is a net decrease in Company Minimum Gain for a Taxable Year, each Member must be allocated items of income and gain for that Taxable Year equal to that Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Members percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year. A Member's share of any decrease in Company Minimum Gain resulting from a revaluation of Company Property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in minimum gain is caused by the revaluation. A Member is not subject to the Company Minimum Gain Chargeback Requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a Recourse Liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss within the meaning of § 1.752-2 of the regulations) for the newly guaranteed, refinanced, or otherwise changed liability.



18

**9.3    Member Minimum Gain Charge back** - If during a Taxable Year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under § 1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income and gain for that Taxable Year (and, if necessary, for succeeding Taxable Years) equal to that Member's share of the net decrease in the Company Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of paragraph (g)(2) of this section. A Member is not subject to this Member Minimum Gain Chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability.

OPERATING AGREEMENT

The amount that would otherwise be subject to the Member Minimum Gain Chargeback is added to the Member's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain Chargeback to the extent provided under the Regulations issued pursuant to § 704(b) of the Code.

**9.4    Qualified Income Offset** - In the event any Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of the Company's income and gain for such year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

**9.5    Interim Distributions** - From time to time, the Managing Members shall determine in their reasonable judgment to what extent, if any, the Company's cash on hand exceeds the current and anticipated needs, including, without limitation, needs for operating expenses, debt service, acquisitions, reserves, and mandatory distributions, if any. To the extent such excess exists, the Managing Members may make distributions to the Members in accordance with their Sharing Ratios. Such distributions shall be in cash or Property (which need not be distrusted proportionately) or partly in both, as determined by the Managing Members.

## ARTICLE X
## TAXES

**10.1    Elections** - The Managing Members may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company.

**10.2    Taxes of Taxing Jurisdictions** - To the extent that the laws of any Taxing Jurisdiction requires, each Member requested to do so by the Managing Members will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest, and penalties assessed on such income. If the Member fails to provide such agreement, the Company may



withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Member shall be treated as a distribution for purposes of Article IX. The Managing Members may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid.

OPERATING AGREEMENT

**10.3    Tax Matters Partner** - The Managing Members shall designate one of their number or, if there are no Managing Members eligible to act as tax matters partner any other Member, as the tax matters partner of the Company pursuant to § 623 h(a)(7) of the Code. Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of § 6223 of the Code. Any Member who is designated tax matter partner may not take any action contemplated by §§ 6222 through 6232 of the Code without the consent of the Managing Members.

**10.4    Cash Method of Accounting** - The records of the Company shall be maintained on a cash receipt and disbursements method of accounting.

## ARTICLE XI
## DISPOSITION OF MEMBERSHIP INTERESTS

**11.1    Disposition** - Any Member or Assignee may dispose of all or a portion of the Member's or Assignee's Membership Interest upon compliance with this Article 11. No Membership Interest shall be Disposed of:

A.    if such disposition, alone or when combined with other transactions, would result in a termination of the Company within the meaning of § 708 of the Code;

B.    if the Managing Members request an opinion of counsel, such, opinion of counsel must be satisfactory to the Managing Members and opine that such assignment is subject to an effective registration under the applicable state and federal securities laws; or



20

exempt from such registration requirements;

      C.    unless and until the Company receives from the Assignee the information and agreements that the Managing Members may reasonably require, including but not limited to any taxpayer identification number and any agreement that may be required by any Taxing Jurisdiction.

**11.2   Dispositions not in Compliance with this Article Void** - Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article is null and void.

## ARTICLE XII

## DISSOCIATION OF A MEMBER

**12.1   Dissociation** - A Person shall cease to be a Member upon the happening of any of the following events:

      A.    The member withdraws by voluntary act from the Company by giving thirty (30) days Notice to the Managing Members.

      B.    The member ceases to be a member of the Company due to the assignment of all of such Member's interest in the Company and the Assignee has become a Substitute Member.

      C. The member is removed as a member by an affirmative vote of a Majority of the members who have not assigned their interests when the member assigns all of his interest in the Company.

      D.    Except where the Member obtains the written consent of all Members at the time, the Member (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition hi bankruptcy; (iii) is adjudicated a bankrupt or insolvent; (iv) files a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation;

      (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding of this nature; or (vi) seeks, consents to, or acquiesces to the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of the Member's properties.

      E.    Except where the Member obtain  ne written consent of all Members at the time, if within one hundred twenty (120) days after the co  mencement of any proceeding against the

 

21

Member seeking reorganization, management, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without his consent or acquiescence of a trustee, receiver or liquidator of the member or of all or any substantial part of the properties, the appointment is not vacated or stayed or if within one hundred twenty (120) days after the expiration of any stay, the appointment is not vacated.

F.        Except where the Member obtains the written consent of all Members at the time, in the case of a Member who is an individual,

(1) The member's death; or

(2) The entry of an order by a court of competent jurisdiction adjudicating the member incompetent to manage his person or estate.

G.        Except where the Member obtains the written consent of all Members at the time, in the case of a Member who is a trustee or is acting as a Member by virtue of being a trustee of a trust, the termination of the trust, but not merely the substitution of a new trustee;

H.        Except where the Member obtains the written consent of all Members at the time, in the case of a Member that is a separate limited liability company, the dissolution and commencement of winding up of the separate limited liability company;

I.        Except where the Member obtains the written consent of all Members at the time, in the case of a Member that is a corporation, the filing of articles of dissolution or the forfeiture of its corporate powers or right to do business;

J.        Except where the Member obtains the written consent of all Members at the time, in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

K.        In the case of a professional services limited liability company, restrictions or limitations are placed upon a Member's ability to continue to render professional services as described in section 53-614(5), Wyoming Code.

12.2     **Rights of Dissociating Member** - In the event any Member dissociates prior to the expiration of the Term:

A.        If the dissociation causes a dissolution and winding up of the Company under Article XIV, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the Dissolution caused by the dissociation and winding up;

B.        if the dissociation does not cause a dissolution and winding up of the



22

Company under Article XIV and the event of dissolution is either 12.1.C. or 12.1.E., the Member shall be entitled to an amount equal to the value of the Member's Membership Interest in the Company, to be paid within six months of the date of dissociation. As to all other events of dissolution defined in Article XII, Section 12.1 which do not cause a dissolution, the dissociated Member shall be entitled to receive an amount equal to the Member's Membership Interest in the Company, to be paid when the Company is dissolved and wound up in accordance with Article XIV. The value of the Member's Membership Interest shall include the amount of any Distributions to which the Member is entitled under the Operating Agreement and the fair value of the Member's Membership Interest as of the date of dissociation based upon the Member's right to share in distributions from the Company reduced by any damages sustained by the Company as a result of the Member's dissociation.

OPERATING AGREEMENT

### ARTICLE XIII
### ADMISSION OF ASSIGNEES ADDITIONAL MEMBERS

13.1   **Rights of Assignees-** The Assignee of a Membership Interest has no right to participate in the management of the business and affairs of the Company or to become a Member. The Assignee is only entitled to receive the Distributions and return of capital, and to be allocated the Net Profits and Net Losses attributable the Membership Merest.

13.2   **Admission of Substitute Members** - An Assignee of a Membership Interest shall be admitted as a Substitute Member and admitted to all the rights of the Member who initially assigned the Membership Interest only with the approval of all the Members. If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interest. The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interest from any liability to the Company that may have existed prior to the approval.

13.3 **Admission of Additional Members** - The Managing Members may permit the admission of Additional Members and determine the Capital Contributions of such Members only upon the approval of a Majority of the Members.

### ARTICLE XIV
### DISSOLUTION AND WINDING UP

14.1   **Dissolution** - The Company shall be dissolved and its affairs wound up, upon the first to occur of the following events (which, u less the Members agree to continue the business, shall constitute Dissolution Events):

A.     the expiration o he Term  nless the business of the Company is continued with the consent  f  of the M  n bers



B.   the unanimous written consent of all of the Members;

C.   the Dissociation of any Managing Member, unless the business of the Company is continued with the consent of all of the remaining Members within 90 days after such Dissociation;

D.   the entry of a decree of judicial dissolution.

14.2   **Effect of Dissolution** -Upon dissolution, the Company shall cease carrying on as distinguished from the winding up of the Company business, but the Company is not terminated, but continues until the winding up of the affairs of the Company is completed and the Certificate of Dissolution has been issued by the Secretary of State.

Operating Agreement

14.3   **Distribution of Assets on Dissolution** -Upon the winding up of the Company, the Company Property shall be distributed:

A.   to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities;

B.   to Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year or, if later, within 90 days after the date of liquidation. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Managing Members.

14.4   **Winding Up and Certificate of Dissolution** - The winding up of a limited liability company shall be completed when all debts, liabilities, and obligations of the limited liability company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the limited liability company have been distributed to the members. Upon the completion of winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State for filing. The certificate of dissolution shall set forth the information required by the Act.

### ARTICLE XV
### AMENDMENT

15.1   **Operating Agreement May Be Modified** -The Operating Agreement may be modified as provided in this Article XV (as the same may, from time to time be amended).

15.2   **Amendment or Modification of Operating Agreement** - The Operating Agreement may be amended or modified from time to time only by a written instrument adopted and executed by all of the Members.



24

## ARTICLE XVI
### MISCELLANEOUS PROVISIONS

16.1   Entire Agreement - The Operating Agreement represents the entire agreement among all the Members and between the Members and the Company.

**16.2   No Partnership Intended for Nontax Purposes** - The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the State Uniform Partnership Act nor the State Uniform Limited Partnership Act.

The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

Operating Agreement

**16.3   Rights of Creditors and Third Parties under Operating Agreement** - The Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third Party shall have any rights under the Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

IN WITNESS WHEREOF, we have hereunto set our hands on the date set forth beside our names.

| | |
|---|---|
| ANNAPURNA GUNDLAPALLI IRREVOCABLE TRUST 2010 | 01/15/2015  Date |
| SANDHYA AJJARAPU IRREVOCABLE TRUST 2007 | 01/16/2015  Date |
| Gajan Mahendiran and Anudha Mahendiran  Tenants by a Entirety | 01/15/2015  Date |
| | Date |

2

## EXHIBIT A

| Member | Initial Capital Contribution and Value | Ownership Interest |
|---|---|---|
| ANNAPURNA GUNDLAPALLI IRREVOCABLE TRUST 2010 | | 20.0% |
| SANDHYA AJJARAPU IRREVOCABLE TRUST 2007 | | 30.0% |
| GAJAN MAHENDIRAN & AMUDHA MAHENDIRAN TENANTS by a ENTIRETY | | 50.0% |
| Total | | 100.0% |

26

## STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD F. MURRAY, III, SECRETARY OF STATE of the STATE OF WYOMING, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF ORGANIZATION

### Nexgen LifeSciences LLC

Accordingly, the undersigned, by virtue of the authority vested in me by law, hereby issues this Certificate.

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **30th** day of **January, 2015**.



Filed Date: 01/30/2015

_____
Secretary of State

By: _____ Lance Cockrell